The United States Court of Appeals in the Fifth Circuit is now open for any call. I say that the United States is honorable court.  Welcome to the afternoon panel. We have five panels sitting this week and we're the p.m. panel, so I'm delighted to sit with Judge Clement and Judge Holt. We have two cases to be argued this afternoon. The first case, number 22-40587, Gibson Brands v. Armadillo. Mr. Bainsot, ready? You may please the court. I'm Ron Bainsot. I represent Armadillo and Concordia in this proceeding. There are two essential questions in front of us today. One is whether the court erred in the wholesale exclusion of evidence of rampant third-party usage of the Gibson body shape marks. Two, if the scope and the territory of the permanent injunction is appropriate in terms of scope and territory. This is a case about genericism. In the run-up, the two-year run-up to trial, the lower court constantly and constantly ruled that it was important and necessary and an essential part of the defendant's case to have evidence of genericism in the marketplace of guitars. That changed when the court pulled the rug out right before trial of the trial strategy of defendants by saying we're going to apply a different standard in a different case. In that case, in a genericism matter, was a case that had to do with secondary meaning. Secondary meaning is not at issue here. That case, the converse case, is purely a secondary meaning and no mention of genericism is in the case whatsoever. The result of that was that we have a five-year look back, a fixed amount of time, five years, nothing prior to 1992 and nothing after 1997 for a jury to look at. The jury was deprived of forty-five years, almost ninety percent of the defendant's evidence of generic usage in the marketplace. What was your core argument as to why the entire expanse? You wanted to go back how far? The way we feel about this, Your Honor, is that we have enough evidence in terms of the 258 exhibits and the witnesses to go back the full fifty years, right? A full fifty years that we can show during trial where we can show the usage of these ubiquitous body shapes throughout the guitar business as being generic. Had you gone the full fifty years, that would have been encompassed with both exhibits and testimony? That is correct. 258 exhibits, not thousands. How cumulative would that have been, that testimony? I'm sorry. Say again, please. That fifty years instead of five. How cumulative would that have been? I mean, would it have added two more days to the trial or was that estimate ever . . . I would estimate it would take one or two days to bring that evidence to trial. We feel that that is an abuse of discretion, that the wholesale exclusion of this type of evidence is represented by the Moore case where, as I quote, wholesale exclusion of evidence requires careful review as they create artificial and unreasonable results. We think this is a reversible error. It's the wrong standard. It's the wrong case. We're talking about genericism. That's secondary meaning. Of course, we . . . Yes, Your Honor. No, we're reviewing ordinarily for abuse of discretion, so we're trying to lean into your argument. Essentially, your argument in court gutted your defense, in my words, I guess. I'll accept that. Thank you. That in terms of the five years would not accurately or fully portray what you were attempting to put in. I guess the other side would say, well, and this happens often in trial where a judge will say, you don't get to put the full load in but you get to put enough in so that the jury amply gets the sense of the genericism here. As you know, that's what we're holding, that's why I'm trying to lean into how the additional years would. Judge Clement asked you, so we're only talking a couple more days. Their argument is that you got enough in to where the jury could get the probative point you wanted, yet the jury wasn't convinced. What's the argument to show it really was completely eliminated your defense as opposed to just not giving you as much potency as you would have preferred? Thank you, Your Honor. In other words, the jury got the teaser and not the movie. They could not see the whole plot. We need to be able to show the fifty years of usage and what is the case that we should be looking at is the Stewart-Spector versus Fender Music Instrument Corporation, Stewart-Spector et al. I'll just refer to that as the Fender case. That is exactly on point where over a fifty year period of exhibits and testimony, which we could show the usage of three main body shapes that were applied for for trademarks by competitor to Gibson Fender, that over that fifty years, those shapes became generic. There's another aspect of that case. If you have evidence that these trade dresser issues have become generic by ninety-two, I presume you could have evidence that it was also generic between ninety-two and ninety-seven. I'm sorry. I couldn't hear the last part, Your Honor. Why is it that you have evidence only before ninety-two? Why wouldn't you also have evidence between ninety-two and ninety-seven? If something is generic at one time, presumably you would have evidence that it's generic at a later time. Well, that's a jury decision to make their determination, which was removed from them. If we can see the fifty years of advertisements and reviews and all the other indicia of genericism over fifty years, the rampant use of these very common ubiquitous shapes, the issue will be they don't act as a source indicator. Is your theory that you're incapable of proving genericism between ninety-two and ninety-seven? That's too short a window. It's an artificial window. It doesn't provide the jury with the full story. As I said, it gives them a teaser. It doesn't give them the plot. The example that, if I can go back to the Fender case, was that the board was able to see the full story of the last fifty years and their determination was that these body shapes are generic. They also found that you have to show the headstock for these ubiquitous body shapes to know who the source indicator is. The headstock's at the end of the guitar and has both the headstock design and the source indicator, the brand. The third part of that is that these were not treated as trademarks. There's a real parallel here between Gibson and Fender. The guitars we're talking about were first brought into the marketplace in the 1950s. Both companies waited between forty and fifty years to apply for trademarks. That is a stark comparison between both of these companies. There are two more cases that ... There are a lot of really good guitars using these body shapes. You'd be looking at many, many, many different guitars utilizing these body shapes with their headstocks and their brand. It's not a question of cheap or inexpensive. They are all competitors in different price ranges. These guitars are made in various different places. They can be made in the United States. They can be made in Japan, made in Korea, made in China. They compete in the marketplace in terms of price, but quality to quality. Guitar players may look at the features of the guitars. They look at the finishes. They look what's on the guitar. They also look at the headstock to know who makes it because these shapes are so ubiquitous. There are two more cases I'd like to review. One is Gibson versus Paul Reed Smith. In that case, and by the way, I just want to add there's no confusion in this case whatsoever. No confusion was found. Confusion is not even mentioned in Appellee's survey. There's not even a question about confusion, but in Appellant's survey, there was zero confusion indicated. When there was a modicum of confusion, it was below a 2% range. The Paul Reed Smith case is important for us because that case where Gibson sued a competitor saying that the guitar was infringing on one of their registered marks, the court held as a matter of law that there's no confusion, no infringement. The famous quote from Gibson's expert is, only an idiot could not tell what guitar is being bought. That you have to look at the headstock to know who the source is. And further, that the court held that the two-dimensional outline, which is the subjects of all of these registrations, cannot serve as the true source indicator because you must look at the whole product. You have to look at the headstock to know who the source is. The next case that is directly on point is the Gibson versus John Hornsby Skews case. And that is that the John Hornsby Skews case has held as a matter of law that counterfeiting could not stand, that no rational jury could see the John Hornsby Skews guitars marked as they are with their headstocks and their brand. No rational jury could see these as counterfeits. So as a matter of law, the court held, no, that's not counterfeiting. That's competition, not counterfeiting. The John Hornsby Skews case also said that federal law doesn't protect generic shapes and does not protect weak marks that are so commercially weak, like there's no likelihood of confusion. Thus, when presented with the full evidence of how these things are viewed in the marketplace, the full story given to a jury, we think that that jury is going to come back and say that these shapes are generic. And of course, the ultimate problem with this case is the absurd result of a company who's been making guitars in this shape for 40 years with their headstock and their brand on it is now being called a counterfeiter. That's an absurd result. So assuming we have your argument on the exclusion, do you want to address any of the other issues? Yes, I do, Your Honor. Whether the permanent injunction should stand as it is. The permanent injunction, the permanent injunction is, in the decision by the court, it said the permanent injunction shows no prejudice to the defendant. And of course, there's ultimate prejudice. You've just been called and declared, and there's a jury verdict that says that you are a counterfeiter. That is destructive to a reputation for a guitar company making those shapes for 40 years. You may lose your endorsers because they can no longer get the guitars in the shapes that they may prefer, and these are ubiquitous shapes. Guitar players may prefer a certain shape, but like I said, it's always by brand. And that the harm to the appellant is that they now have instantaneous stop. They cannot sell, they cannot advertise, they cannot manufacture. And that is, that's extreme prejudice to the appellant. Whether the scope and the territory is a more simple matter. As we were preparing the briefs in this case, the Arbitron case by the Supreme Court came down that stated very two important things. One is that there is no, cannot have a worldwide ban, and two, extraterritoriality would not apply to U.S. trademarks. In the omnibus motion, Gibson did not object to any of this. And in closing on these two matters, one is that these shapes have been called generic in various other territories around the world. In Japan in 2000, the high court held after a 30 year look back that these shapes are purely generic. So anybody can make these shapes in Japan, including the headstocks, just using a 30 year window, not even a 50 year window. The second part was that in the EU, several of the Gibson body shapes have been declared to be generic, including the V shape, one of the shapes we've been discussing here. And that our appellant should be able to sell into these territories because extraterritoriality does not apply to these territories. And therefore, the prejudice is extreme in the way the order is drafted now. Instructional in terms of the Fifth Circuit is that the Snow Wizard case, while it's not guitars, is instructional because the snow making machines, or should I say the ice making machines that had, that were identical to each other, had the indicia of who the headstock was. And that's why it's called these machines. And these machines were not considered to be confusing to anybody. And the court held that there's no confusion, there's no passing off, there's no likelihood of confusion. They all had their own marks in them. This is very similar to the way the guitars are marketed, that they have their own indicia of the headstock and the brand. What's the bottom line, you want a new trial, is that your top line relief you're requesting? Yes sir. Yes, Your Honor. We believe that a jury would find differently given all the evidence. We think that the jury was prohibited from and excluded from seeing all that evidence of generic usage of these body shapes in the marketplace. Therefore we think that a new trial is necessary for the jury to make that proper decision. We've removed that jury opportunity. We have prevented a full day in court for the appellant. We think that appellant deserves that day in court. All right. Thank you sir. May it please the court, Steve Howland with the Co-Counsel here to represent Gibson Brands Inc. Counsel was not trial counsel, so I don't think this is intentional, but I want to start by saying that the characterization of the judge's order that is at issue in the exclusion of evidence part of the case was completely incorrect. I would cite the court to ROA.5815-5817, which is the judge's second order on this issue. The chronology was, we had a pre-trial conference. He went over many motions and liminees. He made his original indication. On this particular issue, there was vehement pushback from appellants and defendants. And so he said, well, I'll have a telephone hearing later in the week. We briefed, we letter briefed that. We had a telephone hearing. Then we letter briefed it again. And then right before trial, he issued the order that I just referred to in the record. It clarified that what was limineed was any ads or sales before 1992. The idea that anything after 1997 was inadmissible is just entirely incorrect. The trial record will demonstrate that there was lots of talk about things after 1997. So that's very important because on the genericness question, the question the jury was asked is, are these shapes generic? They had a cancellation counterclaim that if the shapes are generic, obviously, then we can't prevail under 1125 for infringement. And so that's how genericness was going to be decided. The judge asked, are they generic? And allowed evidence from 1992 to 2022. They had a 30 year window to present evidence of generic uses in the marketplace. What counsel is trying to prove and what they want to prove on a retrial would be that the shapes were generic in 1970 or 1975. That's not the question the statute asks. The Lanham Act has a set of provisions to measure genericness. When you apply for a registration, then the examiner determines, is it generic at that point? And there's a declaration through your registration that at that point, it's not generic. The world has notice of that and can contest it. So if the appellants had wanted to in 1997 before the registrations were issued, they could have come in and said, hey, it's generic now. For the next five years, you can, anybody, any interested party can ask to cancel a registration based on any ground. Is your argument that this evidence, the pre-92 evidence, is not relevant? Yes, your honor. And that's where the Converse case came in that he mentioned. The Converse was about secondary meaning. But what is really being measured is the public's perception of the mark, whether it's likelihood of confusion. The fact that something is generic for a long period of time, a preceding period of time, is at least suggestive that it continues to be generic, absent some dramatic change. And I'm not even sure it happened, but at least in theory, there had to be a dramatic change, right? I'm sorry. But the difference is that in 1997, the USPTO declared it non-generic. The idea that it was generic is just argument. And that brings me to a very important point that I had listed as the first thing I was supposed to say. But the Converse has a second point in there, which is to have an impact on secondary meaning, which is the flip side of genericness, that the uses that they're going to put in front of the jury, these pre-1997 uses, have to be substantially similar. That if it's not very close to the mark, then there is no confusion and no genericness. They contend these 258 exhibits are all exhibits that would have affected public perception because they are examples of similar marks before 1997. This panel has no way to judge that. Those 258 exhibits are not in the record. And so all we have is a representation that they are similar marks. And so at first point, I don't see how you can judge their argument without looking at what was excluded. And as an example, I would cite to ROA 9552, which was Defendant's Exhibit 1493. That is a picture of a guitar. The physical guitar was manufactured by Jackson. And it is a post-1992 guitar. So it was admissible under the judge's ruling. And their contention is, well, that's a use of Gibson's mark, the flying V mark. That exhibit has a guitar that has very pointed legs. The legs are the bottom of the guitar. They come to a sharp point at the bottom. If you look at that picture exhibit, you would see it. The registration was Plaintiff's Exhibit 1, ROA 9395. And then ROA 9398 is a picture of the actual Gibson flying V. And ROA 9403 is a picture of the Dean-branded, their flying V. What you will see is their V is an exact copy of our V. But our contention would be that ROA 9552, the Jackson V, is not a similar use. It is a third-party use, but it's not a similar use of our mark. And we would have the same argument about many of these 258 exhibits that they're relying on. So without you having the ability to say, is that in the ballpark of a similar mark, I don't see how the court can resolve that issue. But what is your evidence that people are buying these shaped guitars, immediately thinking that's obviously Gibson, without checking? OK, so that would be the counterfeiting argument. And there's a variety of evidence. Is your point that that's not relevant to the trademark claim? No, we have to prove likelihood of confusion to win. It goes with both, right? And so likelihood of confusion in the Fifth Circuit has been recognized time and time again that there are a variety of ways you can prove likelihood of confusion. Surveys and whatnot. Well, there's the proof that goes in there, but there's also theories of confusion. And one of them is the initial interest theory, that you cannot bring somebody in to your store through the use of somebody else's trademark, and then sell them something that they know is your brand. The best example of that is the Elvis case that's cited in both of our briefs. The customers that were lured in to the use of an Elvis Presley trademark to a taco shop admittedly realized that this is not associated with Elvis, but it got them into the store. And that's initial interest confusion, and that's an improper use of the trademark that is covered under likelihood of confusion. I would point out that in- In other words, there's confusion at time one. Right. Not confusion at time of purchase. Right. That's sufficient. And that is sufficient. And I would point out that that goes back several decades. In September, after briefing closed on this case, this court entered the Rex opinions that deal with, and I'll get the site for you here, but those cases dealt with competing real estate brokers. And they both had Rex in their advertisements and things like that. And what happened was the evidence of actual confusion was potential real estate customers called the wrong place. And to their credit, the Rex that was the wrong place said, oh, you're not looking for us. You're actually looking for the other Rex and sent them on their way. And so there was no transaction that occurred, but the court still said in September of last year that that is evidence of actual confusion because it's initial interest and it's drawing away customers. And because the site to that is 80F4607. The discussion is on page 623. And so that result obtained because the test for confusion isn't that the sale actually occurred. It's the likelihood that out of the tens of thousands of guitars that are sold every year, that some of that, is it likely that some of that got diverted? And so hopefully that answers your question. You're saying that's what happened here. Right. And the evidence at trial of whether that actually happened is, one, there is, find the record site for this, and cite the court to ROA 9398, which was plaintiff's exhibit 387 at trial. And what that shows is a music retailer. It was the Music Zoo. And it's a picture, and Mr. Aljong Goh's testimony was around this particular exhibit. And what it shows is a picture of the guitar in a boxed icon. And people, if they like that guitar, they hit that icon, and they're taken to the Music Zoo portion of the store that would be selling that model of guitar. So that's the Flying V, well, excuse me, that's the Dean V and the Dean Z, or Dean, I forget exactly, but it's their knockoffs of our Flying V and Flying Explorer guitars. And it's a very important exhibit because it shows a couple of things that go to sort of both of his arguments. There was another exhibit of Lenny Kravitz playing Go Your Own Way. We played the whole video for the jury. And he's playing Gibson's Flying V. And there's commentary that goes with that video that says, we do these videos, and it shows time and time again just the body shape of the guitar. And the purpose of that, from the guitar maker's perspective, is to drive sales for people that want to play that body shape because they want to appear like Lenny Kravitz. And so when you go back to ROA 9398, what do you see? You don't see a headstock that has Dean on it and a different headstock. All you see is the body shape. How does that help you, assuming it's generic? Well, if you assume that it's generic. Let me rephrase it. Where is the confusion that the viewer thinks that's Gibson as opposed to another brand? When they look at that body shape. I get the point that they want to be like the player. Where's the, I want to be a Gibson player? Well, because when they look at that, they see that's a Gibson body shape that has been around for a long time. They know Lenny Kravitz plays Gibson. And they look at that, and they click on it. And then all of a sudden, they're in the Dean portion of the music zoo store. And they're thinking, well, this is actually a little bit less than the Gibson. But they used it to get them into their store and make that sale where otherwise they would have bought a Gibson guitar. And it's so confusing that the point of Aljohn Goh's testimony, Mr. Goh is the chief of our Epiphone brand. I suppose the viewer could have one of two possible reactions. One is, I want a Gibson guitar just like that one. Or two, I want a guitar just like that one. What's the evidence that we're in the first bucket, not the second? I assume you have to prove that, right? That we're in the first bucket. Well, no. What we're saying is that, and that's the point of the trademark being our source identifier. That's why we sue people, is that the guitar world, guitar buyers, associate that shape with Gibson. And the argument is, well, there's no confusion here. But because there's a headstock that says Dean on it. But there's not. And so they're using the shape to draw them in to buy something other than a Gibson. And again, what you're referring to is point of sale confusion. I bought this guitar believing. No, no, I'm focused on your interest theory. I'm just, what I'm trying to figure out is, that's not evidence of confusion. That's evidence that there could be confusion. You still need to ask the earlier threshold question, what is in the person's mind when they see this? Is it Gibson guitar, or is it just cool looking guitar? So the level of proof is, we only have to prove a likelihood of confusion. And the idea would be that, yes, I'm interested in a Gibson guitar. And I know that to be a Gibson shape. And if somebody else. That is your theory. What I'm trying to figure out is, why is that theory supported by this Lenny Kravitz example that you're giving me? Because on the Lenny Kravitz video, it is a Gibson guitar. And people know that it's a Gibson guitar. And they want to emulate Lenny Kravitz. Don't you have to prove that people know it's Gibson, or think of it as Gibson? No. I mean, there are actually seven or eight factors that go into the likelihood of confusion. Yes, that proof would be helpful in the case. But it is not a requirement. The fact that it happens to be a Gibson guitar in that video, that's enough to establish the likelihood of confusion. No. The jury has. So let me back up a little bit. A long line of Fifth Circuit cases say evidence of actual confusion is not necessary to prove likelihood of confusion. It's all built on what the public's perception would likely be. And so we prove how strong the marks are, that they are iconic, that there are books written about them. And this is all in the record. There's books written about the shape of the guitars. We prove that we market the shape of the guitar. And the use of the trademark, how prevalent it is in the guitar world, basically. And from that, there is an inference the jury can draw. They can find, yes, I believe that most guitar pliers associate that with Gibson. And that's the purpose of a trademark, is that that shape means Gibson to most guitar pliers. Let me ask you a question before you run out of time. Sure. You have relied extremely heavily on Rule 403 exclusion to destroy this case. Do you have any cases or any authorities that would allow that kind of a treatment in Rule 403? Well, first of all, it didn't destroy the case. Because I want to point out, one, again, you'd have to assume that the exhibits say what they say they do before you could reach that conclusion. And two, I point out, they had no witness that could sponsor these. They list seven in their offer of proof, seven people. Six of them were either their employees or our employees. None of them had personal knowledge  They couldn't say, we placed that exhibit, or this exhibit caused a spike in guitar sales, or any of that. They had one expert, a vintage guitar expert. And he supposedly would synthesize all of this and be able to explain. And that theory would obtain is, if these exhibits are inadmissible, experts can rely and talk about inadmissible evidence to support their conclusions. So they're going to get it in through their expert witness and say everything that he's arguing today. Except the expert witness was an expert. When we started asking him about the guitars, all he would say is, I don't know about it other than the fact that my assistant and the lawyer in the case were able to find these on the Wayback Machine in the internet or through a subscription service called For Obscure and Lesser Known Guitar Shapes. And so they did have an opportunity to present the evidence. They just didn't do it very well. And the jury found accordingly. But you, I mean, you all, of course, are more familiar with the record than we are. But the way it was presented, your argument in answer to Judge Hull was that this evidence was not relevant. In two different places, it seemed earlier on the district court said it wasn't relevant. And then at another time, he said it was relevant. But his exclusion is, Judge Clement asked you, seemed to be around Rule 403, not confusion in the trademark sense, but the typical 403 balancing sense. And so, at least as presented, the argument seemed to be the district court didn't exclude it because it wasn't relevant, somewhat along the lines of what you're saying. But on balance, this would be confusing in the jury's mind, not trademark confusion. And so with the question of, OK, what's the difference between the 50 and the five, he says a few more exhibits, et cetera, et cetera. But if I give you your argument is that it was excluded because it was not relevant. It would not prove up what they said. It would prove up. So just where in the record, and you may have said it, are we able to hone in that that which you argued is precisely the reason that it was excluded, as opposed to maybe my notion that it wasn't relevant, but the confusion to the jury? Because I'm looking at the jury verdict form and instructions and so forth. And it seemed like the court was careful to tailor things, so it's hard to square jury confusion. In that sense, from this fairly laborious jury verdict form, so it's hard to see how 200 more exhibits would have been more labor. Do you understand what I'm saying? I do. And I'm out of time, but if I could answer your question. All right. So first of all, obviously, we argued at the motion in limiting such states, both 401 and 403. And either rationale would be sufficient to affirm the verdict and affirm the judgment. Second, the 403, we would have to show prejudice to us, or undo prejudice to us. And the point there was that we argued is that if you go back 50, 60 years, then you can't put those things into context. For instance, one of them appeared to be a German manufacturer. Well, we can't determine now, and there is nobody to depose now, about where that ad actually appeared. And so that's our prejudice. If they had come in, you flip that to the post-1992 ads that did come in. What happened was there were 10 or 12 depositions taken of those manufacturers. So we could find out, how many of those did you actually sell? How many, what publication was this in? What impact did it have? So they had 30 years to do that. But we could attack that evidence. If you put in evidence, and this is for trademarks that were tried here, their argument would be, any trademark, a Coca-Cola bottle, we could go back and argue, well, it was generic in the 20s. Well, here's a picture of some other bottle of soda that's in a very close to a Coca-Cola bottle. Do we know if there was one of those, or do we know if there were 10,000 of those, or a million of those? Because I get your argument, but I think somewhere in my question was, where in the record will we find, succinctly, the absolute basis upon which the court ruled? That's all I was asking, and your explanation's helpful, but just, as I said, presented facially, it looked like a 403 ruling. Your argument was relevance, et cetera, and just so that we could penetrate this whole trial record, I was just asking if there's a specific, because in dealing with the motion in limine, he made some preliminary rulings, and he made other rulings, so. But we'll dwell in it, but I think we have your argument. I can sort of pinpoint, maybe, record things for you to look at there, and I'm sorry for misinterpreting your question. That's okay. So, it would go back to what I started the argument with, which was the chronology of how this motion in limine occurred, and admittedly, there is some confusion, and the judge melded his final order to meet the arguments and recognize the confusion that had occurred. So, I gave you the record site of 5815 to 5817, which is the final order, and if you wanna see how it developed, there are hearing transcripts and the pretrial hearing transcript, and the actual motion in limine filings, and you can sort of see the development of how you got, excuse me, to that 5815, 5817. All right, thank you. All right, we have your argument. We'll dig into it. All right, counsel, you have reserved rebuttal. Let's start with the basics from what learning counsel has just introduced. There's no confusion in this case. No confusion whatsoever. Confusion was discussed. There's no confusion in this case. No one has ever bought a Dean guitar thinking it was a Gibson guitar. No one has ever bought a Gibson guitar thinking it's a Dean guitar. When Dean guitars and other guitars in a V shape are sold, they're sold in music stores, guitar stores. They're sold with cases, boxes that say the name, cases that say the name. If it's a gig bag to carry it around that has the indicia of their source, they have warranty cards that are going back to the company that makes that guitar. Our position is let the jury see the evidence. That's the position we're taking. Well, just to go back, though, on your timing on the no confusion point, what about their theory that you should go back in time and look at interest, not point of purchase? Let's discuss that. Listen to the pretzel logic, to quote Steely Dan, that the appellees have gone to. They're trying to tell you that players and buyers buy by shape. Nobody buys by shape. People buy by brand. You don't go to the music store, go to the shape store. You don't go to the mall to the shape store. You go to a guitar shop that's got 30 or 40 brands. And if you walk into that store, you're gonna see these ubiquitous shapes with different headstocks and different brands on them, sold side by side. This interest, this point of interest theory is somehow we're gonna drag you into our music store so you can only, and see only a Gibson or think you're buying a Gibson and we're gonna bring you in and somehow that's you've been suckered in is absurd. That's not how music stores are. These things are sold side by side. People want to buy by brand. They don't buy by shape. In terms of the expert, the appellants expert and past expert for Gibson have written the books about guitars together. To claim that he's not an expert is also relatively absurd. He was hamstrung, I am quite sure. No, I was not trial counsel, but I read the record. He is hamstrung to talk about things within a five-year window. I'm sure that was very difficult. If he is a vintage guitar expert, means he cannot discuss the reality of the guitars in question. By way of example, nobody has discussed, people want to talk about numbers of sales. I can give you some numbers of sales. The Gibson Flying V, as it's called, was made for two years and discontinued and less than 100 were made. The Gibson Explorer guitar, made for two years, 22 were made. What makes them iconic is not the shape. What makes them iconic is that they're rare and there's so few of them and they're valuable. They're like rare coins. Very few of them were made. When these shapes were brought back into the marketplace, for example, with the Flying V, when it was brought back to the marketplace in 66 and 67, 11 were made. We're not discussing millions and millions of guitars that everybody's copying. It's a shape that became ubiquitous and when these shapes left the marketplace, people stepped in to make them because players wanted them. They wanted certain woods. They wanted certain features. They wanted certain finishes. That's what the 70s is all about. The 70s brings all, and that's why we have to go back to the 70s to show how these things started and all the way, and I disagree with Council, that the full opportunity to see exhibits after a certain date, we don't agree with that. We don't think that's what took place. There's also this comment about knockoffs and that's a denigration of so many different guitar companies just because they use a similar shape. That's not how this works. Both Epiphone, a brand of Gibson, and Dean make certain guitars overseas. That's true. They also make guitars in the United States. To call it a knockoff, it would be to say I'm on the corner buying a handbag. That's not a knockoff. These are guitars with their indicia, with their headstock on the boxes, on the warranty cards. So when someone buys these, we're talking about somebody who knows what they're buying. Let the jury see this information. If I may just have a last moment here. If you go to garageband.com, you're going to see an emblem on over one billion pieces of electronics on their screen from Apple, iPads, iPhones. You're gonna see a guitar shape as the icon. That guitar shape could be a Gibson, it could be a Guild, it could be a D'Angelico, it could be a Sire, it could be a Dean, it could be a Stumach, it could be a Harley Benton, or any other dozens of manufacturers of that type of shape. If you look at it, you'll know exactly what our point is, is that that is the essence of genericism. And Gibson's experts have stated time and time again, you must look at the headstock. The body shapes do not act as source indicators. All right, so you have a red light. Thank you. Thank you, counsel on both sides. An interesting case, to put it mildly, come in the day.